***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon review of the evidence affirms with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, and the North Carolina Industrial Commission has jurisdiction over the parties and of the subject matter.
2. Employee makes a knowing, voluntary, affirmative and counseled decision to pursue his workers' compensation claim herein before the North Carolina Industrial Commission.
3. The carrier at risk at the time of the alleged injury by accident was Reliance National Indemnity Company, through Gallagher-Bassett, which has declared bankruptcy.
4. Defendant-employer regularly employs three or more employees and is bound by the North Carolina Workers' Compensation Act, and the North Carolina Industrial Commission has jurisdiction to hear this matter.
5. The employer-employee relationship existed between the plaintiff-employee and defendant-employer on or about 17 July 2000, the alleged date of injury.
6. The average weekly wage was sufficient to entitle the plaintiff-employee to the maximum compensation rate of $588.00 for the year 2000.
7. There are no N.C. Gen. Stat. § 97-10.2 issues presently pending that need to be addressed by the deputy commissioner at the time of this hearing.
8. In addition, the parties stipulated into evidence the following: (a) a packet of documents listed in Schedule C; (b) a packet of medical records submitted 17 June 2003; and (c) the Pre-Trial Agreement dated 2 January 2003, which was submitted by the parties is incorporated by reference.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is fifty-eight years old and a high school graduate. He also took some college courses at Campbell University. Prior to the incident in question, plaintiff suffered from a speech impediment and some limitation of motion of his left shoulder due to a congenital injury. However, plaintiff had been able to work for twenty years as a surveyor and for approximately twelve years as an electrician despite those limitations.
2. As of July 2000, plaintiff had been employed by defendant-employer for approximately one and one-half years as a journeyman electrician. His job duties included installing wiring and conduits, and hanging lights. Defendant-employer's home office was located in Raleigh, North Carolina. Plaintiff lived in Kinston, North Carolina and had to travel to job sites in Columbia, South Carolina; Little Rock, Arkansas; Durham, North Carolina; and Petersburg, Virginia while working for the company. The jobs could last for weeks or months and he might be laid off for a short while before being assigned to another one.
3. In early July 2000, plaintiff was working on a project at a Toyota transmission plant in Durham. On Monday, 10 July 2000, shortly before he was scheduled to be laid off, his supervisor, Charlie Sanders, informed him that he was needed at the Chaparral Steel Mill in Petersburg, Virginia on that Thursday. Ken Parker, the supervisor at the Petersburg plant, had asked his project manager for some additional workers and plaintiff was one of those named. Consequently, plaintiff reported for work at the steel mill in Petersburg, Virginia on Thursday morning, 13 July 2000, and he worked for two days while the plant was shut down. This job was only to last through that Friday, but Mr. Parker offered plaintiff a maintenance position for at least the next week at the plant beginning the following Monday since the regular maintenance employee had quit. Defendant-employer provided ongoing maintenance work at the steel mill. Plaintiff accepted the offer, but advised Mr. Parker that his driver's license would expire the next week unless he renewed it, so he would have to wait until he could get his license renewed before he could leave Kinston on Monday morning. Mr. Parker was willing to accommodate him and allowed him to come in late that day.
4. Accordingly, plaintiff drove to Petersburg after attending to his license renewal Monday morning and reported for work at 1:00 that afternoon. He worked until 5:30 and then left the work site to find a motel where he could stay. Mr. Parker had informed him that he would only receive $25.00 per day per diem for the maintenance job, so he needed to find an inexpensive motel. Plaintiff settled on the Flagship Inn, which was at one of the interstate intersections. The room cost $42.50 per night, which was less than other motels in the area but still more than his total per diem amount that also covered his meal expenses. Apparently, the company assumed that multiple employees would usually share a motel room.
5. Plaintiff was not to receive any per diem for Monday, 17 July 2000, however, since defendant-employer's rules required that employees work a full day in order to receive the travel allowance, and plaintiff had not worked a full day. Nevertheless, his job for that week was approximately 160 miles from his home and too far to commute. It was necessary for plaintiff to find lodging locally. He was expected to be back at work at 7:00 Tuesday morning.
6. At approximately 11:30 Monday night, plaintiff left his motel room to get ice from the ice machine to make his lunch for the next day. He heard a voice behind him, turned around and was confronted with several assailants, who beat him and knocked him unconscious. He regained consciousness and discovered that the assailants had robbed him of the money he was carrying, approximately $81.00. An ambulance subsequently took him to the local hospital where he was examined. He had a laceration under his right eye, which was stitched. There were other abrasions and lacerations to his face, including contusions under his eyes and a left eye subconjunctival hemorrhage. In addition, plaintiff's two front teeth had been knocked out and he experienced right shoulder pain. A CT scan of plaintiff's orbits revealed a depressed right orbital floor fracture, so Dr. Smith, an ophthalmologist, examined him. No specific treatment was recommended since his vision had not been affected. An x-ray of plaintiff's right shoulder was interpreted as showing a mildly displaced fracture of the coracoid process. Consequently, Dr. Prakash, an orthopedic surgeon, was also consulted.
7. Plaintiff was discharged from the hospital on 19 July 2000 with instructions to get medical treatment at home. On 20 July 2000, he went to his family doctor for follow up care. Dr. Crisp referred him to Dr. Cooper, an orthopedic surgeon, for evaluation of his right shoulder injury. Dr. Cooper examined plaintiff on 21 July 2000 and had new x-rays taken, which did not show an obvious fracture. Dr. Cooper diagnosed a severe soft tissue injury and placed plaintiff's arm in an immobilizer. Plaintiff continued to experience pain, weakness and limitation of motion of the shoulder. On 14 August 2000, Dr. Cooper injected the shoulder with a cortisone solution and sent plaintiff to physical therapy. Plaintiff only participated in physical therapy a few times before being sent to Dr. Lamont Wooten, an orthopedic surgeon in Greenville, North Carolina, by the Department of Vocational Rehabilitation.
8. On 30 August 2000, Dr. Wooten's physician's assistant examined plaintiff and found evidence of structural damage within the shoulder and ordered an MRI. The MRI revealed a large, retracted rotator cuff tear. Dr. Wooten recommended surgery. On 13 September 2000, Dr. Wooten repaired a massive rotator cuff tear involving complete avulsion of two of the four rotator cuff tendons as well as medial dislocation of the biceps tendon. After the operation, plaintiff was treated with medication, gradual range of motion exercises and physical therapy. Considering the severity of his injury, Dr. Wooten thought that plaintiff ultimately recovered well.
9. Dr. Wooten released plaintiff from medical care on 5 April 2001. At that time, plaintiff was still reporting problems with reaching overhead and nighttime pain. Dr. Wooten opined that plaintiff would always have trouble with overhead activities due to the damage to his rotator cuff and that he would be limited in his ability to work at shoulder height or above. In Dr. Wooten's opinion, plaintiff's limitations would likely prevent him from being able to perform the regular duties of an electrician unless the job was significantly modified.
10. Plaintiff did not attempt to return to work for defendant-employer and did not look for work elsewhere.
11. On 17 July 2000, plaintiff was an employee whose job involved traveling to the job sites where defendant-employer assigned him work. Since he was then working at a steel mill in Petersburg, Virginia, he was a traveling employee. Defendant-employer did not pay a per diem allowance to local employees. As Mr. Sanders, plaintiff's former supervisor, testified, it was more cost effective for the company to hire local workers since local workers did not receive the per diem travel allowance. Nevertheless, the company routinely assigned employees, including plaintiff, to jobs that required them to travel and find lodging. The fact that defendant-employer's rules prohibited plaintiff from receiving the per diem amount for the night of 17 July 2000 does not negate the fact that plaintiff was required to stay in a motel in the area since he was so far from home, in order to be able to report for work on time the next morning.
12. At the time of the assault, plaintiff was getting ice at the motel where he was staying. This was an activity that a traveling employee would reasonably be expected to do. The purpose of the assault was robbery. Plaintiff did not know his assailants. There was no personal motive involved with the attack. A traveler staying in a motel would be expected to be carrying cash in order to pay for meals, drinks, fuel and other incidental expenses. Consequently, as a traveling employee at a low cost motel, plaintiff would have been placed at some risk for being robbed. The risk was incidental to his employment, which required him to obtain lodging away from home in places where he was unfamiliar with the neighborhood.
13. The fact that plaintiff was assaulted constituted an unusual occurrence. As a traveling employee, he was within the course of his employment and the assault arose out of his employment.
14. Plaintiff was unable to work in any capacity from 18 July 2000 through 5 April 2001 as a result of the injury by accident on 17 July 2000. He reached maximum medical improvement on 5 April 2001, with respect to the right shoulder injury he sustained as a result of the accident. On that date, Dr. Wooten assigned plaintiff a 25% permanent partial impairment rating to the right shoulder. However, plaintiff indicated that he was electing to receive ongoing benefits for wage loss in lieu of permanent partial disability for his rating.
15. As an electrician, plaintiff was required to work from ladders to hang lights and install wiring. He was required to work at shoulder height or above on a regular basis. Due to his right shoulder injury, he was unable to perform his regular duties as an electrician or perform any job that requires overhead or shoulder-height work. Since his injury, defendant-employer has not offered him other suitable work. Plaintiff had preexisting difficulties with his left shoulder and a significant stuttering problem. His preexisting conditions, combined with the physical restrictions resulting from his right shoulder injury, would affect his ability to find alternative employment. Although plaintiff's preexisting problems did not prevent him from working as a surveyor for twenty years, it is not clear from the evidence whether plaintiff's restrictions resulting from both shoulders would prevent him from working as a surveyor. Dr. Wooten was asked whether plaintiff's injury, combined with his pre-existing condition would limit his ability to work. Dr. Wooten would only opine that, "if one has an injury to one arm, he would be less functional if his other arm is not normal. So in that sense, an injury to one arm can be more disabling in an individual who has only one functional arm."
16. The medical evidence did not establish that plaintiff was unable to work in any capacity after 5 April 2001. Nor did the evidence establish that it would have been futile for him to seek alternative employment. Since plaintiff did not make any effort to find other employment after Dr. Wooten released him, the Full Commission has insufficient evidence from which to find that plaintiff's disability continued after he reached maximum medical improvement.
17. Plaintiff may have also sustained the loss of some teeth, although that was also not clear from the evidence since there were comments in the medical records that indicated that the teeth were perhaps part of a bridge and might have not been his original teeth.
18. The Virginia Criminal Injuries Compensation Fund and the North Division of Vocational Rehabilitation paid a portion of the medical expenses plaintiff incurred as a result of his injury by accident.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In Cauble v. Soft-Play, Inc., 124 N.C. App. 526 (1996), the N.C. Court of Appeals held that:
 North Carolina adheres to the rule that employees whose work requires travel away from the employer's premises are within the course of their employment continuously during such travel, except when there is a distinct departure for a personal errand. Martin v. Georgia-Pacific Corp., 5 N.C. App. 37, 41, 167 S.E.2d 790, 793 (1969). The rule's rationale is that "an employee on a business trip for his employer must `eat and sleep in various places in order to further the business of his employer.'" Id. at 42, 167 S.E.2d at 794
(quoting Thornton v. Hartford Acc. Indemn. Co., 198 Ga. 786, 32 S.E.2d 816 (1945)). Therefore, `"[w]hile lodging in a hotel or preparing to eat, or while going to or returning from a meal, [a traveling employee] is performing an act incident to his employment.'" Id.
Therefore, a traveling employee is within the course of his employment continuously throughout the travel unless there is a distinct departure on a personal errand. N.C. Gen. Stat. §97-2(6); Martin v. Georgia Pacific Corp., 5 N.C. App. 37 (1969).
2. Plaintiff's work in Petersburg, Virginia required him to find lodging for the night because his home was in Kinston, North Carolina. Therefore, plaintiff, as traveling employee, was in the course of his employment at the motel on the night of 17 July 2000 and his injuries were due to risks associated with his employment. N.C. Gen. Stat. § 97-2(6); See also Hobgood v. AnchorMotor Freight, 68 N.C. App. 783 (1984); Martin v. Georgia PacificCorp., 5 N.C. App. 37 (1969).
3. On 17 July 2000, plaintiff sustained an injury by accident arising out of and in the course of his employment with defendant-employer. As a result of his injury, plaintiff was incapable of earning wages in any employment from 17 July 2000 through 5 April 2001.
4. Plaintiff is entitled to temporary total disability compensation at the rate of $588.00 per week for the period of 18 July 2000 through 5 April 2001. N.C. Gen. Stat. § 97-29.
5. Plaintiff had the burden of proving both the existence of his disability and its degree. Hilliard v. Apex Cabinet Company,305 N.C. 593 (1982). Plaintiff has proven that as a result of his injury, he is incapable of returning to his pre-injury job as an electrician. As a result of his injury, plaintiff is limited in his ability to work at shoulder-height or above. Since plaintiff has made no effort to locate suitable employment after he reached maximum medical improvement on 5 April 2001, the evidence does not establish that plaintiff was incapable of earning wages in any employment after 5 April 2001. N.C. Gen. Stat. §§ 97-29;97-30; Effingham v. Kroger Company, 149 N.C. App. 105 (2002).
6. Plaintiff is entitled to permanent partial disability benefits in the amount of $588.00 per week for 60 weeks. Although plaintiff elected compensation for loss of wage earning capacity, the more munificent remedy for plaintiff is compensation for permanent partial disability under N.C. Gen. Stat. § 97-31, as plaintiff has not proven loss of wage earning capacity after reaching maximum medical improvement. N.C. Gen. Stat. § 97-31. Plaintiff did not adequately address the loss of teeth issue. Consequently, no award is made on that issue at this time.
7. Plaintiff is entitled to have defendants provide all medical compensation arising from this injury by accident. In addition, the Virginia Criminal Injuries Compensation Fund and the North Carolina Division Vocational Rehabilitation are entitled to reimbursement for the medical expenses they paid to plaintiff's medical care providers for treatment of this injury. N.C. Gen. Stat. §§ 97-2(19); 97-25; 97-143-547.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay temporary total disability compensation to plaintiff at the rate of $588.00 per week for the period of 18 July 2000 through 5 April 2001. Defendants shall also pay permanent partial disability compensation to plaintiff in the amount of $588.00 for 60 weeks, an additional $35,280.00. This compensation has accrued and shall be paid in a lump sum subject to the attorney fee hereinafter approved.
2. Defendants shall pay all medical expenses incurred by plaintiff as a result of this injury by accident. The Virginia Criminal Injuries Compensation Fund and the North Carolina Division Vocational Rehabilitation shall be reimbursed for their payment of medical expenses regarding this claim.
3. An attorney fee in the amount of twenty-five percent of the compensation awarded in Paragraph 1 is hereby approved for plaintiff's counsel, which fee shall be deducted from the aforesaid award and paid directly to plaintiff's counsel.
4. Defendants shall pay the costs.
 ORDER
Any claim plaintiff may have for loss or injury to his teeth or facial disfigurement is reserved.
This the ___ day of June 2004.
 S/__________________ BERNADINE S. BALANCE COMMISSIONER
CONCURRING:
 S/_____________ PAMELA T. YOUNG VICE-CHAIR
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER